Mr. Clement. Mr. Chief Justice, and may it please the Court, the States entered the Union saddled with substantial war debts. As a result, critics of the Constitution were quick to point out any possibility that the States could be hailed into court by individual citizens without their consent in order to secure potentially bankrupting judgments. When this Court opened up the possibility of just such a judgment by allowing Chisholm, a South Carolina citizen, to sue the sovereign State of Georgia in this Court, the nation quickly and emphatically reacted with the Eleventh Amendment that eliminated the possibility of such a suit even in this most neutral of Federal forums. Regardless of all that, Respondent's position is that if Chisholm had turned around and sued Georgia in South Carolina's State court, and South Carolina, in its unreviewable discretion, decided to exercise jurisdiction over the sovereign State of Georgia, there is nothing in Federal law. Kagan. There's one significant difference there, Mr. Clement, which is that States are on a par with each other, so there's a kind of mutuality. So if one State does something to you that you don't like, you can turn it around and do it to them. And that mutuality also makes it less likely that the State will do that thing to you in the first place, because they know that. So the thing that Mr. Farr says is the fact that there was this outrage with respect to a Federal court might not have registered in quite the same way when States were aware that they were on a par with each other and that they had many weapons that they could use against each other. Clement. Well, Justice Kagan, here's why I disagree, and because most of the weapons that independent nations would use vis-à-vis each other to ensure that sovereign immunity as of comity did not become sovereign immunity in name only are precisely the tools that the States surrendered to the national government in the plan of the  So if South Carolina had to do that, it would be a different story. Kagan. Well, for sure, Mr. Clement, you know, you couldn't go to war with the neighboring State anymore. And that's a difference. But you could say, if you're going to treat me like that, I'm going to treat you like that. And you have other ways of dealing with a State that you wouldn't have with the Federal government. Clement. Well, Justice Kagan, two points. First, it's not just the act of war. It's the ability to impose trade sanctions. It's the ability to withdraw your ambassadors. All of that is taken away from the States. Kennedy. Is there anything in our jurisprudence or our constitutional tradition that states can protect each other by retaliating against each other? Well, that's the second point I was going to make, Justice Kennedy, which is it's an odd thing to think that the Framers, who had just experienced the Articles of Confederation, where they had unsatisfied judgments and the potential that if the State of New York went after the State of Georgia, because Georgia hadn't complied with the requisition for funds, that there would be civil war, the idea that the way they would want sovereign immunity, which no one doubted existed in Forrest, was that kind of race to the bottom. I mean, I thought that it's illegal for a State to ban Washington apples. Well, there is that. It's something that's implicit in the Constitution. And I think that the This is meant to take it down to the practical level, getting involved with war. Take Nevada against Hall. But Justice Kagan's point is if California says that a Nevada truck coming on its California roads, injuring a California resident, so Nevada is liable to the courts and the law of California, Nevada can say fine, if a California truck comes into our State and injures Nevada people, we will do the same thing. That's what I think Justice Kagan had in mind. Absolutely. And I think that's the exact opposite of what the Framers were trying to do. They weren't trying to adopt a union where there would be signs on State borders that say if you come in here, you thereby waive any sovereign immunity, and we will hail you into court and allow our citizens to do it. Instead, they were adopting a union where the States came in with substantial war debts and their sovereign immunity. And there is no way they would have sacrificed their sovereign immunity, which was the key protection for those war debts not being used against them to bankrupt them. Sotomayor, the system that you're advocating, just so I get it right, you're saying constitutionally, every State is immune from any acts that they commit, this is the only acts they commit against a non-citizen, even if they've waived sovereign immunity within their own State. All I have to do is, what, there's no non-citizen of a State who can ever be held who could ever sue a State for whatever bad acts they've had. Two points, Justice Sotomayor. First of all, let's take a Nevada resident and let's say California comes in. The Nevada resident can certainly sue the State of California in California court if there's a waiver of sovereign immunity. And the Privileges and Immunities Clause of Article 4 would protect the Nevada citizen from California saying, well, we're going to waive our sovereign immunity as California citizens, but not Nevada residents. So that's one protection that they have. The other point is, what we're really talking about is, as a starting point, is the default rule. Do you start with sovereign immunity? It's always possible for States to agree to waive their sovereign immunity. Sotomayor, why would they do that? I can understand them getting together, which they haven't done, to agree upon limits to each other's or waivers of sovereign immunity, but what would induce them to come together to do that? I suppose consideration If they don't think that they're forced to. Well, considerations of convenience. I mean, Nevada and California could decide that they have sufficient comedy and respect for each other, that it's perfectly fine for California to be sued in Nevada court. But conversely, they could come and make a contrary decision because of their sovereign immunity and say, no, if you want to sue us, come into our courts, and in a case like this. Sotomayor, 34 States tell us that they didn't like this rule. Forty-five. Forty-five. How come they haven't gotten together and done an agreement among all of them? Because it would be very burdensome to do that, and I think with all due respect, they think there already was an agreement among the States through their people that solved this problem, and that's the Constitution, and it preserved the sovereign immunity they would have. If I could There's no question that they gave this is why the Eleventh Amendment. They gave up a lot of things to the Federal Government, and I can understand why they thought they needed the Eleventh Amendment. But what makes you think that they gave up their sovereignty with each other with respect to these kinds of issues? It's not in the Constitution. Two things principally, Your Honor. First is, I don't think they actually gave anything up. What my friend on the other side suggests they gave up is the right of one sovereign court system to hail another sovereign into that court system, and that is a right that didn't exist at the founding. And that's what Hall said didn't exist. I mean, Hall said the States vis-a-vis each other don't agree to respect the other's sovereign immunity. Hall distinguished sovereign immunity where you are the king, where you are sovereign, a State's immunity, and then said, but when another State is in the picture equally sovereign, then both of them are sovereign and neither has to respect the sovereign immunity of the other. That it's just, well, when the Nation was new, you will admit that there was no full-facing credit obligation. If one State was going to respect the sovereignty of the other, it would be a matter of comedy, right? Clements, you say comedy, I would say as a starting point law of nations. But absolutely, it is true that whenever you are talking about sovereign immunity in any court other than the sovereign's own, you are talking about sovereign immunity as of comedy. So when did it change from comedy to an obligation? Upon the framing of the Constitution, just as it did with respect to every other sovereign immunity principle. The principle that emerges from this Court's cases is that if the States had preexisting sovereign immunity from a suit and they did not sacrifice it in the plan of convention, then they continue to enjoy it as a matter of constitutional right. Scalia, I would have thought you would answer that the obligation was an obligation of international law, that comedy was an obligation of international law insofar as it extended to sovereign immunity of each State not being hailed into the courts of another State. That was international law. Ginsburg-Ginzburg The very concept of comedy is a matter of grace. That's international law. That's what this Court said in Hilton v. Geo. Comedy is not a kind of a full faith in credit. Clements, but two points are important, Justice Ginsburg. First of all, although the law of nations as the framing between independent nations was a matter of comedy, that didn't mean that there weren't certain principles that were so well established that any nation that didn't respect them would be committing an act of war. And first on that list would be the idea that you could not have an in personam suit against a foreign sovereign. It was unheard of. And my friend doesn't disagree with that.  of comedy. Ginsburg-Ginzburg Well, haven't we now recognized that there is no automatic immunity for a sovereign nation, another nation, that the Foreign Sovereign Immunities Act said, yes, sometimes we respect the sovereignty of that foreign nation, but sometimes we don't, like in commercial deals?  Clements, but two points are important, Justice Ginsburg. Right, Justice Ginsburg. And I don't think that you want to resolve this case on the law of nations' immunity principles either in 1789 or today. But if you were to do that, we would still win, because despite the relative laxity of waivers of sovereign immunity in the current age, you still don't have an in personam suit for something that's a core sovereign function, like tax collection. Even to this day, we couldn't sue France over the exact same situation today. But I don't think the way that this Court's cases apply the law of nations is the right way of thinking about this. Rather, the right way to think about it is that sovereign immunity at the framing becomes a constitutional principle. And I think it's a certain irony, isn't it, that California is the state that has given us a Nevada against California, right? And California then was saying, oh, yes, we can sue the sovereign Nevada in our courts if they come into our State and hurt our people. It was California. And so is California now saying they were wrong in the argument that they made? Clements, Well, I think the FTB is asking you, which is an arm of California, is asking you to overrule Hall. So I think it is fair to say that there is some buyer's remorse on the principle of Nevada against Hall by the sovereign State of California. But we're not stopped from making our case. Kennedy, California has joined the amicus brief, has it not? Clements, They didn't, but I think that's because they felt that an arm of State was already here. So I think, you know, that explains that. But I want to make one point very clear, which is this Court has a whole host of State sovereign immunity cases dealing with the Federal courts. Every one of those cases, with the — every one of the Federal court cases, and indeed every State sovereign immunity case with the exception of Alden v. Maine, is a case that's applying sovereign immunity as of comity, because the new Federal court system is a foreign court system. The sovereigns did not have sovereign immunity as of right in any distinct court system of a superior sovereign or of an independent nation. So when this Court says, well, the States had sovereign immunity and they didn't sacrifice it in the Constitution, they're not talking in those cases about sovereign immunity as of right. They're talking about sovereign immunity as of comity. So, too, in the tribal immunity cases. And everybody on this Court — Ginsburg. Mr. Clement, what do you do with — I mean, one time we had this issue, and the argument that you're making was made in Alden, and the Court spent over two pages distinguishing Levada v. Hall on that very point that when there are two sovereigns involved, then it's different. Clement. Oh, absolutely, and that's because Alden is the only case that involves sovereign immunity in the State sovereign immunity context. There are also Federal sovereign immunity cases. But in the State sovereign immunity context, Alden's the only one that's dealing with sovereign immunity in the sovereign's own court system. Every other one deals with sovereign immunity in a different court system, either the Federal court system or the tribal court system. But Alden does say, we determined the Constitution did not reflect an agreement between States to respect the sovereign immunity of one another. Well, I think that's because — I assume that comes from the part of Alden where Alden's dealing with Hall as a given, and is saying that the result in Alden does not require the overruling of Hall. I would take that. That's fine. That's true. They are different issues. I do think they create one anomaly after another. I mean, Chisholm can't sue Georgia in a perfectly neutral Federal court. Chisholm can't sue Georgia in Georgia court. But Chisholm can sue Georgia in the least neutral court available, the State of South Carolina. That doesn't make any sense. There's also the anomaly that apparently Alden's mistake was suing Maine in Maine court. If Alden would have sued Maine in New Hampshire court, probably for Federal law or maybe for State law, then that suit could have gone forward. It is also anomalous that the tribes apparently have greater immunity than the States, even though they are inferior sovereign, because you applied these same principles to recognize tribal sovereign immunity. And the dissenters in footnote 1 of those cases, even they recognize, well, States are different because they are a superior sovereign. Breyer. Well, they are not totally bizarre. It flows from the principle in Nevada that the State maintained the sovereign power to define the jurisdiction of its own courts, which is also an important sovereign power. So if you look at that power, then you have to say, well, what is it in the Federal Constitution that limits or takes away that sovereign power? So that's, I think, where I'm left after Nevada, and now you have a whole set of arguments, but they require us for the most part to overrule several cases. Well, I don't think so, Justice Breyer. Let me make two points, one of which may not be particularly responsive to you, which is to say that I think all of this Court's post-hall decisions, some of which you haven't joined, actually suggest that the burden is not on me to show where in the Constitution it was taken away, but that the burden is on my friend to show where the Constitution specifically took away the State's sovereign immunity, where they surrendered it. But I still think, Justice Breyer, I'm not trying to not get your vote, because I think even if the burden is on me to show where the Constitution took it away, I think I can. I think it's implicit, but I think it is implicit in three places, Article 3, the Eleventh Amendment, and all the provisions that took the diplomatic and war tools away from the States. Breyer. I'd like to get your response to the second part of this, because you're just, I mean, I do, that's, I'm finding that rather hard, and it seems to me intuitively at some level correct that a State like Nevada should not be able to give the State to give less sovereign immunity to California than it gives its own officials. So I thought, well, where in heaven's name does that come from? And that's what's bothering me, and I'd like a theory. I have, all I have so far is this. Full faith and credit, two statutes, sometimes exist. And there is also, when you're giving full faith and credit, the competing principle that if you have a policy of your own State that cuts the other way and it's reasonable and so forth, you don't give full faith and credit. And here, if you're following that kind of principle, the same kind of principles in the Commerce Clause, too, you would say, fine, Nevada, since it doesn't give its own people the sovereign immunity, doesn't have to recognize California's because of the public policy it's following, that as soon as they run out of sovereign immunity, which is at $50,000, I think, now they have no reason, and therefore they have to follow California's law. Now, I raise that because it's in the back of my mind. I've been thinking about it. And I don't find in the briefs either that theory or a competing theory about why you can't do it. You see where I'm going? I'd love to do one. I think you do, Justice Breyer, and I'm going to give you my best answer on that, which is ultimately going to loop back to Hall. So my best answer on that is the way to think about this is Nevada has said we're going to apply Nevada law, not California law, and Hyatt One says that they can do that. But then, when they start to apply Nevada's law of sovereign immunity, they get to the point where there's a 50,000 damage cap, and they say, unbelievably in my view, but they say, oh, well, this statute only applies to Nevada's government agencies, and you're not a Nevada government agency, so you don't get the benefit of it. Now, if Nevada did the exact same thing to a citizen of California in a damage cap that applied not to sovereigns but to citizens, I read my friend on page 52 of his brief to say that that would violate the privileges and immunities clause of Article 4, that you couldn't just say, well, no, that's a benefit only for Nevada residents. So his position ultimately is the sovereign is worse off than the citizen, which can't be right. Now, I think there are two ways to respond to that complete anomaly. One is to say that, although maybe it's not right there in the text of it, that the principles of Article 4's full faith and credit clause provide the same principle, the same protection, that the privileges and immunities clause applies to a citizen. But I think ultimately the better way to look at it is to say the reason the Framers put the privileges and immunities clause in Article 4 of the unamended Constitution is they realized States could be sued in other States' courts. So there was a vulnerability they needed to address. They simultaneously implicitly recognized that there was no way on earth that a sovereign could be sued in another State's court because of age-old sovereign immunity principles, so they didn't feel they needed to give express protection to the sovereign the way they did to the citizen. Scalia. Mr. Clement, I assume, but maybe I'm wrong, that it follows from your argument that a State could not adopt the equivalent of the Foreign Sovereign Immunities Act and make other States suable in their State courts for commercial activities. Clement. Not of its own force. I mean, I think one way of thinking about this is I don't think one State. I don't know what you mean, not of its own force. Well, they might be able to agree to that mutually as a waiver of their sovereignty.  I'm talking about a State just enacting a sovereign immunity. State legislature enacting a statute that is the equivalent of the Foreign Sovereign Immunities Act. Any foreign State that is doing business, not just foreign country, foreign State that's doing business in this State can be sued if it's commercialized. Right. I think that's the power they yielded to the Federal government in the plan of the Convention. But that does raise the question. So that creates something of an anomaly, which is that foreign States can be sued, but your sister State can't. That's a little strange, isn't it? No. No, I don't think it is strange, Your Honor. But I mean, I think, come at it from a different angle, and maybe you get to a different place. I don't know. But I think it would be plain as day that the day after the plan of the Convention passes, the State of South Carolina can't entertain a suit against His Majesty the King of England in their — in South Carolina court because of law of nation principles first or the fact that they yielded the opportunity to do that to the Federal government. I think in the same way the States yielded their ability to make determinations, make treaties with foreign governments over foreign sovereign immunity. They yielded that to the Federal government. But vis-a-vis each other, what they preserved as a constitutional matter is an immunity from being hailed into each other's courts. Mr. Clement, Justice Scalia's question does suggest that there are sovereign interests on both sides of this, right? There is one is I want to have sovereign immunity, I want to avail myself of sovereign immunity, and the other is I want to subject another State to my court system when I feel like it, and I want the choice of doing that or reaching an agreement with another State that we should all treat each other nicely. So on your view, the States are giving up some significant sovereignty interest. They are keeping one, but they are also giving up one. And the question that you have to answer is, why is it so obvious that the States would have made that choice rather than the other choice, which is, hey, it's been working out for us just fine to have the choice and to deal with our States on a going-forward basis on principles of mutuality? Clement, Justice Kagan, I think there's two reasons that it is glaringly obvious that the States would have made exactly the choice I'm suggesting. One is, they weren't giving up anything they actually thought existed. They did not think, because the law of nations categorically forbid it, that they had the power to assert in personam jurisdiction over a foreign sovereign. They absolutely – yes, it was law of nations that laid down that principle. Ginsburg, it wasn't – didn't Chief Justice John Marshall explain that as to a foreign country, yes, there was a rule of comity, but it was not – it was not binding. We were not bound by comity, yes, because nations should be – treat each other with respect. But obligation, no. I thought that was the whole distinction made in Schooner. Well, Justice Ginsburg, two points about that. First of all, here is what Chief Justice Marshall says about the amenability of the sovereign to suit. He says, quote, ''One sovereign being in no respect amenable to another.'' He lays down that as the bedrock principle of international law. Now, it is true that when you're talking about international law, every nation has the raw power to disregard international law. So the United States'— You didn't put it in terms of raw power, did you? I think if you read the whole opinion, that's exactly what he's saying. You would have the had – I mean, think about it. Schooner Exchange arises in 1812. We're already at war with Britain. So he did have – the Federal courts would have the raw power to exercise jurisdiction over a ship of France, but there's a very good reason they didn't do it, because they recognized that asserting that kind of authority would be equivalent to an act of war. And that's why I think it's so obvious that the States did give this up, because the authority to bring in a foreign sovereign into your court was unthinkable to that generation as a flat violation of the law of nations. And if they did it, it would be committing an act of war. And that's exactly like the other things that they gave up. The second reason I think it's glaringly obvious, though, is that on the one hand, they give up something that's inchoate and a violation of the law of nations. Sovereign immunity, on the other hand, is the single most important issue they're dealing with because of those war debts. And that's why they're not going to – if they had to make a choice, a conscious choice, they would gladly give up some inchoate right they've never exercised in exchange for preserving themselves from the possibility of an individual citizen suing them and procuring a possibly bankrupting judgment, if I could reserve the balance of my time. Thank you, counsel. Mr. Farr. Mr. Chief Justice, and may it please the Court. Since much of the discussion this morning is turned on the possible overruling of Nevada v. Hall, I'd like to start, if I might, by setting out what I think are the two main reasons why Nevada v. Hall shouldn't be overruled. First of all, the Court in Nevada v. Hall, unlike the Board in its argument, took account of the fact that after the formation of the Union, the states retained a great deal of their essential sovereign attributes, and that it was fundamentally inconsistent with those sovereign attributes for another state to declare itself immune as of right from its jurisdiction. The second reason is that the Board has failed to show that the ordinary political processes, in particular, an agreement among the 46 states which are now represented before the Court saying they all agree there should be absolute immunity in each other's courts, why they can't reach that agreement and have that effectively be the law going forward without the intervention of this Court and without the need for this Court to set up. Scalia, they would need the intervention of Congress, I assume, right? Hall, I'm sorry, Justice Scalia? Scalia, they would need the intervention of Congress. Hall, I do not believe they would need the intervention of Congress, because this is not a different case. Scalia, it's not compacts between States always required approval by the Congress. Hall, I beg to differ, Justice Scalia. Under this Court's cases, the Culear case, that's correct, that the question is whether an agreement among the States is an aggregation of State power at the expense of the Federal Government. If that's true, then Congress's approval is needed. But there are agreements among the States, some of which are actually called compacts, which do not require the consent of Congress, and I have no belief that this one would. I mean, this is not — if the States got together and mutually agreed, we're going to honor each other's idea of sovereign immunity in our own courts, I don't see any reason that Congress would need to resolve it. Kennedy, it would seem to me quite disruptive of the union that the Constitution contemplates, in that States would make different arrangements with each other. Maybe they would freeze other States out, you would have States bargaining with each other. It seems to me that that causes great dissension. Well, Justice Kennedy, there's always been some — For instance, California Franchise Tax Board has — collects tax from people all over the — all over the United States. And I could see some States saying, well, let's leave California out of this agreement, but we'll agree with ourselves. That seems to me highly disruptive. Well, you do have the 45 States supporting California in this case, making the total of 46. So in this particular case, there really are not very many States that are outside the circle. But if you say we're just going to throw the States back on themselves, all the States negotiate with each other, that's not part of our constitutional tradition at all. Well, Justice Kennedy, I guess I do disagree with that. I mean, there is something that's been set up by the Council of State Governments called the National Center for Interstate Compacts. And its job is to help the State facilitate agreements among themselves on matters of common interest. And there are hundreds of these agreements. So the idea that the States should not be able to get together and formulate policies that are mutually beneficial to them and reach them by agreement, rather than approaching the Federal courts and saying overrule one of your prior cases or invent a novel principle of Federal law to limit the damages, seems to me exactly what the States as sovereigns ought to be doing. Ginsburg. What was the first reason for saying keep Nevada? The first reason, Justice Ginsburg, is that Nevada v. Hall recognized in a way that the Board never does that there are two sovereign interests at stake here. And one can read the Board's briefs and listen to the terrific argument this morning, and one will not ever hear one word about Nevada's sovereign interest here in protecting and compensating. Well, I think Mr. Clement says that there are two answers to that. One is that they actually never exercised that sovereign interest. So it didn't mean very much to them. And the other is that in exercising that sovereign interest, they would be violating the norms of international law so that they wouldn't have really thought that that was a significant and exercisable interest. So those are his two arguments against it. Right. And I don't think, frankly, either one really carries much weight. I mean, the first one is a chicken or egg problem in a sense. It is true that they were not the States had not exercised their power, if we're talking about the late 1700s. They'd only had the power for 10 years, but they hadn't exercised the power to subject other States to their jurisdiction. Nathan versus Virginia is an example where with the intervention of the Pennsylvania executive officials, the Pennsylvania court said, no, we're not going to exercise jurisdiction over Virginia. But the other side of that, of course, is that they always had immunity as a matter of comedy from the other States. So if one is looking at the question of how do we think about this, looking back in time several hundred years, what decision would the States have made? The answer is we really don't know. They weren't faced with that. If the States thought that they had retained this power, why have you not cited any cases in which this was exercised before Nevada v. Hall? Because there basically are no cases where the power was exercised. Up to that point, the courts, I mean, the courts of the various States were treating the other States as immune. There weren't very many suits filed, but immune as a matter of comedy. But that, of course, is exactly what the relationships between these sovereigns are all about. If one goes back and starts with a foundational decision, which is Schooner exchange, Schooner exchange is a very important decision about sovereign immunity, but it's also in principally a decision about sovereignty. And what Schooner exchange says is that each sovereign within its own territory has exclusive and absolute authority. And therefore, if another sovereign is going to come into that territory and act contrary to the laws of the sovereign, it can only do that with the consent of the home sovereign. That's the principle on which all of this is based. So this, although there are obviously two sovereigns involved, and a sovereign interest in each case, an interest in immunity on the part of the visiting sovereign, an interest in having its exclusive authority over its territory on the part of the home sovereign, Schooner exchange actually tells you the answer if they come in conflict. Because the requirement of consent of the home sovereign is what is ultimately predominant. Scalia, Mr. Farr, I'm concerned about the Eleventh Amendment, which, of course, does not prevent a state — its words do not prevent a state from being sued in Federal court. They only prevent a state being sued by citizens of another state in Federal court. Okay? And we held it goes beyond that. Chisholm, which prompted the Eleventh Amendment. It was Hans, which held that it's also citizens of the same state that cannot sue in Federal court, but that's not in the Eleventh Amendment. That rested upon — this is what Justice Hughes said it rested upon. Manifestly, we cannot rest — we cannot assume that the letter of the Eleventh Amendment exhausts the restrictions upon suits against non-consenting States. Behind the words of the constitutional provisions are postulates which limit and control. There is the essential postulate that the controversies as contemplated shall be found to be of a justiciable character. There is also the postulate that States of the Union still possessing attributes of sovereignty shall be immune from suits without their consent, save where there has been a surrender of this immunity in the plan of the Convention. In other words, Hans says there's an assumption behind the Eleventh Amendment, that the States cannot be sued without their consent. Now, why should that apply only to suit in Federal courts and not to suits in the State — in the courts of other States? I think the answer to that, Justice Scalia, is because the situations are very different. I think, in fact, I mean, the notion that the board, I think, presents generally — and I want to get very specifically to the question, but I don't want to just preface it with this one observation, if I may. The board's suggestion, I think, is what the court really just needs to do now is put the third leg on the immunity triangle. It's already made clear that States have immunity in their own courts, which is the English tradition, and that States have immunity in Federal courts, that's the Eleventh Amendment. So all, really, the court should be doing now is to draw the last part of that and say they have immunity in the courts of other States. But those are all different situations. The States have immunity in their own courts, just as nations do, because they are the sole sovereign involved there. There aren't two sovereigns when you're talking about immunity in your own courts. So that's one separate thing. Now, to get specifically to the question you're raising, Justice Scalia, immunity in the Federal courts, which is broader than the language of the Eleventh Amendment. And, of course, the Federal courts are courts of a different sovereign, in a sense, than the State courts. But at the time that the Constitution was being drafted and the question of ratification came up, this was an issue that was specifically discussed. And, therefore, when the States were concerned about ratifying the Constitution because of their war debts, they raised questions, and the framers, like Madison and Hamilton, so on and so forth, gave them assurances, and that was the deal. They said the assurances were based upon the postulate, the assumption that no State, of course, can be hailed into the courts of another sovereign without its consent. That was the answer, and that answer applies not just to being hailed into the Federal courts, but being hailed into the courts of other States. But, Justice Scalia, to be blunt about it, there is no such postulate. I mean, if sovereign immunity is what the Board says it was, or is, that a sovereign can never be sued without its consent in the courts of another State, then the entire international world is operating on an incorrect premise. Nations can be sued in the United States under the Foreign Sovereign Immunities Act for commercial torts, I mean, excuse me, for commercial activities, for certain torts, without their consent. They can't take the Republic of Austria case, the Altman case, where the Republic of Austria objects to the United States jurisdiction. They say it's outside the FSIA, they say you don't have jurisdiction over us. But the Court doesn't say, you're right, you're a sovereign, you have — it's unthinkable you would be subjected to suit in our courts. The Court resolves the case against the Republic of Austria and finds no sovereign immunity. So there isn't such a postulate as broadly worded as you suggest. Scalia How do you explain Hans v. Louisiana? Fisherman Hans v. Louisiana is the second part of the triangle. That's the question of a State being sued in Federal court. And Hans v. Louisiana makes perfect sense. I mean, if one says at the time of the convention, the States were concerned about being sued in Federal courts, and the deal that was made, essentially, was they were given assurances, if you ratify the Constitution, you will not be subject to suit at the behest of individuals in Federal court. If you accept that deal, and then you look at the language of the Eleventh Amendment, well, the Eleventh Amendment does — the language doesn't capture that deal, because it leaves aside suits by citizens of your own State.  Mr. Farr, Mr. Clement suggests that it's unthinkable that a State would be so concerned about being hailed into Federal court, but not just as concerned, or even more so, about being hailed into suit of another State. What is the response to that? Fisherman The response to that is that that argument just doesn't give proper weight to the balance of power and the difference in the balance of power between the Federal government and State governments, and between the State governments horizontally. When you're — to go back again to the formation, Justice Kagan, if — if one is looking at the situation that the States were facing at that time, they're forming a new union. So they get a say in this, because they have to ratify it before it actually exists. So when they're looking at this, what do they see? They see a sovereign that is going to be a superior sovereign. What does that mean for sovereign immunity purposes? It means that if that sovereign is sued in the States — in the State courts, the States have to dismiss the suit. There's no principle that is any clearer than the fact that a superior sovereign cannot be brought to answer in the courts of inferior sovereigns. So that's — that's the state of play. With respect to the other States, however, there's inequality. They could subject other States to suit in their courts, but if they did, then they might be subject to suit because comedy breaks down. Scalia. Why do you say it was so — so clearly established that a superior sovereign could not be sued in the courts of a lesser sovereign? Because now we — I'm sorry? I thought we invented that system of two sovereigns, a superior sovereign and a lesser sovereign. What — what examples of the absolutely clear rule that you can't be — a superior sovereign can't be sued in a State court? I think if one looks at English common law, you have stratifications in English common law. You have no sovereigns in England except the king. Well, the king was not answerable in lesser courts. Maybe I used the word sovereign improperly there. It's a different point. Okay. If the fact — If I don't want to — Pardon. I'm sorry, Justice Breyer. Well, I — I just want you at some point to give three minutes to — I mean, I will accept for argument's sake that the great issue in Philadelphia in 1787 was a division of power between a Federal government and the States, not questions of what States could do in respect to each other. And they wrote what they wrote, but that's what they're thinking of. And you're saying the second is what's at issue here. That's correct. And therefore, therefore, we have two cases on it. We went through the whole thing. At the very least, don't open it. All right? I'll accept. Or don't go back, because it's at least not that clear. And therefore, I'll accept that. Now I would like just two minutes on what's bothering me. And what is bothering me is I really don't see how Nevada can say we're going to give immunity to our own State, but we won't accept California's similar immunity. Now, that doesn't seem intuitively right, but if I look at the Constitution, I see it says this. It says, Full faith and credit shall be given in each State to the public acts of other States. California has a public act which gives immunity. Nevada is not giving full faith and credit to that. I think those acts can sometimes include statutes or common law rules or decisions of courts. So I say, how does Nevada get away with that? Answer, because they have a strong public policy in not doing it. Namely, the policy of they don't give anybody, including their own officials, that kind of immunity. If that's the answer, that answer runs out of steam at the very point that they try to give officials more immunity than California is giving. Now, you see how I've lined up that legal reasoning with what seems intuitive, but I have no idea, to tell you the truth, about whether there's precedent for that, about what that might, in fact, get us into trouble on or et cetera. So I would — you must have thought through this. If I look in the briefs, the answer to this question of equal treatment, I can't find much. Well, I think that the important part there is that the only Federal basis that they have really identified that conceivably could support this claim is the full faith in credit clause, because it is a Federal law. It's part of the Constitution. But the full faith in credit clause reinforced by it is the same policy there. It exists under the Commerce Clause, too, and the Privileges and Immunities Clause. That's the part I want to get to, because if one applies the full faith in credit clause, remember, of course, the Court did this in Hyatt 1 and rejected California's argument that its immunity law, giving absolute immunity, has to apply, and Nevada has to apply that. So the Court has already crossed that bridge, at least to some extent. Now, I agree with you, at that point there was not a judgment, so there was no comparison of the damage. But then the question is, what is the full faith in credit standard that this Court applies? And that is the same standard that the Court applied in Hyatt 1, and that is, if Nevada is competent to legislate, it can apply its own law, it doesn't have to apply California law at all. And Nevada's own law, unless you try to rewrite it on some basis, which I'll also get to, California's law does not give immunity to other States in the same way it doesn't give immunity. Nevada's law says if you're a Nevada worker, a State, you don't have to pay a dime. In fact, you have to pay $50,000. But if you're California or some other State, you could pay $40 million. Now, but let me go to your point here. No, I understand that, but I'm just going to want to be precise about this, because I want to just walk through it step by step. All I'm saying is Nevada law does not provide a cap for officials from other States. And what trouble will I get into with precedence? Constitution or something else, if I were to write the words that I suggested. Once they go beyond their own immunities, they run out of steam and they have no reason for not following California's law. Ginsburg. You don't think that's right, because you're arguing that it's not. No, he doesn't think it's right. I want another reason. And, Justice Ginsburg, thank you, because I'd like to point out, I think, maybe by going step by step, I didn't get to the step I want to get to quickly enough, but the step that I want to get to is there is no requirement in the full faith and credit clause that goes on top of, are you competent to legislate with respect to the torts at issue? In other words, when a State says, we're going to apply our own law to a lawsuit that it is competent to legislate about, has legislative jurisdiction, it doesn't have to answer a second question that says, well, we can allow you to do that. Can you show us a public policy of yours that would be offended by applying the law of immunity? Breyer, but in marriages and all kinds of things, I've seen the public policy language, when there is a right for a State to ignore the public act of another State where there is some kind of, it's some kind of policy orientation. But I want to draw a distinction between the constitutional test, which is, are you competent to legislate? That's the sum total of the constitutional test. Now, of course, just because you haven't violated the Constitution when you're applying your own laws doesn't mean that the way that your decision to apply your own laws is not challengeable as a matter of State law. Scalia. I'm not following. I guess I'm not. The California law that is being given or that is argued to be given full faith and credit here is what? The California law on sovereign immunity? You're well right to be confused, Justice Scalia. All California says about sovereign immunity is you can't be, we can't be sued in our courts. I don't think California has a law that says we can't be sued anywhere, do they? And if they did, would they have the jurisdiction to say that? I don't know. I don't think that, well, because of what the Court said in Hyatt 1, they don't have the power to enforce their own immunity and their laws on another State if that What's being given full faith and credit, then, under the argument here? The original argument, the fact is that the Board has changed its argument about full faith and credit, and that's why it's confusing. In its brief, originally, the Board said we're asking that Nevada apply California's law of immunity. Now, they can't ask that it be applied totally because that was already rejected in Hyatt 1, so they say above the $50,000. That's what we're saying. Apply California's law of immunity above the $50,000 mark. In their reply brief, however, at pages 4 and 5, they're emphatic that they're not asking the Court to apply California law at all. They say we're asking that Nevada's law of immunity be applied. Well, that, in its literal terms, simply doesn't work. California's law of immunity doesn't apply to California. So what the Board is groping for is some sort of loose principle that the Court could apply to override a State's judgment about how to apply its own laws of immunity, all in the interest, I might note, of promoting State sovereignty. But leaving that aside, the question is where would that come from? If — let's assume hypothetically that California brought an original action in this Court, and it said we want an injunction ordering Nevada to apply its damages cap to all suits against California in Nevada courts, this is assuming the Court doesn't overrule Nevada v. Hall, as I certainly hope it doesn't, what would the basis in Federal law be for that lawsuit? The only basis that I see in their brief, in Federal law, is the full faith in credit clause, and for the reasons I've explained, if you apply the standard full faith in credit constitutional provision, that does not help them. Comity is a voluntary doctrine among States, and their equal footing doctrine seems miles away from anything we're talking about. Secondly, even if the Court had the power, some Federal law generally, maybe Federal common law, which is always something the Court, I guess, can create if necessary, why would they particularly choose this rule? Because, although it sounds perfectly logical, and it is a benchmark, I mean, Nevada uses it not without this one exception, but Nevada uses it to knock down punitive damages, claims against negligence, all of that. As a benchmark, it's a perfectly fine rule for States to choose. But as a mandatory Federal rule to impose on the States, it's not quite so good. Ginsburg. It's a little odd that the Nevada court said, Comity, as far as punitive damages, we're not going to slap California for punitive damages, but no Comity for above 50,000. Well, I think that its explanation of that I think actually makes quite good sense. They say, you know, when we're compensating our people, we're not just compensating. Compensation serves two purposes. It serves the compensation, it helps the person obviously cope with their injuries. And I should, by the way, point out that under the overruling of Nevada v. Hall, anybody who is injured by a State gets nothing, but just that's a digression. Back to the main point, when you're talking, however, about a situation with officials of another State, we also want, we have an element of protection, trying to protect our citizens. We don't need the same protection from our own government. We hire these people, we train them, we supervise them. We can keep things from getting out of hand like they did here, where somebody just sends out on a vendetta against a particular taxpayer. We can stop that, but not when it's another State. So the idea of having more compensatory damages in order to discourage that kind of behavior, it actually seems to me quite reasonable. Alito, you seem to be arguing that no matter how hostile one State is to another, there would be no requirement, there would be no requirement for equal treatment. I mean, you're making, that argument seems to point to the need to overrule Nevada v. Hall, if that's the case. Suppose Nevada really were completely hostile, uniformly, consistently hostile to California on issues of collection of taxes? There would be no remedy for that. And you could say, well, the States could enter into an agreement, but if it's not in the interest of both States, they wouldn't enter into the agreement. Well, I don't see why it isn't in the interest of both States. I mean, it is always true you could have an outlier State. But just let me take the example, though, of California and Nevada, because, again, if we're looking at equality here, which is supposedly what the equal treatment principle is all about, and I put equal treatment principle in quotes, if we're looking at that, another possible way of looking at things which States and nations have done for years is reciprocity. Now, if you look at this case from the standpoint of reciprocity, what do you look at? Well, you, that brings in Nevada v. Hall. And in Nevada v. Hall, there was no cap on damages. Nevada was subjected to unlimited damages in California. That's exactly the same thing that happened here. California was subjected to an unlimited compensatory damage.  But you accept that California had unlimited damages for its own people. But that's correct, Justice Ginsburg. But if you're looking at the relationships between the two States, which is what we're looking at here in the question of how States treat each other, reciprocity actually is more important. It's no solace to Nevada to say, well, you had to pay unlimited damages in California, but they only have to pay $50,000 to your citizens because they have a different rule. That doesn't help. Nevada is being treated unequally whether the California rule is different or not. If Nevada didn't want to give California tax people the benefit of no punitive damages, that would, it could do that, right? It would be a matter of comedy. To be honest with you, I have my doubts about that. I suspect the subject would never come up. But in talking about this idea that there could be something that this Court could impose on the States, there are things, for example, that could be drawn from international law that might, in fact, provide some sort of check, if they were truly universal values. Equal treatment is not a universal value. For example, the United States is exempt in its own courts for torts based on the battery and assault and false arrest. Foreign sovereigns are not. Under the Foreign Sovereign Immunities Act, the foreign sovereigns do not have immunity for those same torts. So if there's an equal treatment principle at large in the world and it's universal, then that seems to me to be something that the United States cannot do. But nobody suggests that that's inappropriate because these are all comedy-based. Ultimately, sovereigns can serve their own interests if they're willing to accept the possibility that other sovereigns will do that as well. So when I go back to this idea, is there something out there, I don't think one can ever completely rule that out when you're talking about arrangements among States and among sovereigns, because there is Federal common law. But there is no principle. Ginsburg-Gilmour, before your time is up, to answer the argument based on Keogh Tribe, that is, that Indian tribes are immune from suit by individuals in State courts. So the argument that your colleague gave is, how can the States have less dignity than the Indian tribes? Well, let me just answer. I don't want to take much of my time, extra time, but the fact is that they obviously have dignity. They are sovereigns, and that's one of the reasons that they are treated so much with so much comedy. But the reason that they don't have the exact same immunity is the historical basis is different. The Indians and their particular centralized relationship with the Federal government is an explanation for why they essentially partake of the same kinds of immunity that the Federal government does. Roberts. Thank you, counsel. Mr. Clement. Thank you. Four minutes. Thank you, Mr. Chief Justice, and may it please the Court. Three basic points in rebuttal. First of all, my friend on the other side quite rightly points out that the States' burden with their war debts were very, very concerned that they would be hailed in front of the new Federal courts. So they sought an assurance. And the clearest place to see the assurance that they got is Federalist No. 81, where Alexander Hamilton makes clear that there's nothing to worry about here because they have sovereign immunity. And they have sovereign immunity as an inherent aspect of their sovereignty. And that assurance then becomes the postulate that this Court applies in Hans v. Louisiana and applies in Monaco v. Mississippi and all of these other cases where the immunity that's provided by the Constitution is actually greater than the text of the Eleventh Amendment. The assurance and the postulate are one and the same. Now, it may be that in the world of international relations we've wandered away from the Hamilton Federalist No. 81 understanding. But I don't think that matters. If it's constitutionalized as it is in every other context, then the understanding in 1789 is what controls. Now, as to the all-important point of this balance that you referred to, Justice Kagan, I do want to be as emphatic as I can that the States were not giving up anything they thought they possessed. And I came upon a quote from Edmund Pendleton talking about sovereignty. And he said the following in 1792, and if you want to find this, this is Volume V of the Documentary History of the Supreme Court. He said, I have been taught by all writers on the subject that there is no earthly tribunal before whom sovereign and independent nations can be called and compelled to do justice. Now, I think that's pretty emphatic, and I think it pretty emphatically suggests that on the one hand, they weren't giving up anything that they could really exercise. On the other hand, they were desperately afraid of these war debts, and they were desperately wanted to ensure that they would preserve their sovereign immunity. I don't think the balance is even close. And what I think is so problematic about Respondent's position is that he seems to say that at the precise moment that the States were going to give up all of the tools that nations used to make comedy a reality, that they unilaterally disarmed. They gave up all those tools, and all they got was sovereign immunity as of comedy, which my friend's position makes clear is as voluntary as can be, and it's just a matter of grace. There's nothing that supports it. So I just wanted to finish with some anomalies here, because we've talked about a couple of them. We've talked about this idea that the Privileges and Immunities Clause would prevent Nevada from doing this to a citizen. Here's another anomaly. Now, my friend suggested briefly as a parenthetical that there's nothing that these poor Nevada citizens are going to be able to do. One thing they can do is go to California and sue consistent with California's waiver of sovereign immunity. As we point out in the reply brief, there are some remedies there. But the other thing they can do, as Justice Kennedy pointed out for the Court in Alden, is there's still the possibility of an individual capacity suit against one of the California officers. Now, here's something anomalous. If you sued the California officer, who's presumably a California resident, they would have the protection of removal to Federal court, so they'd at least be given a neutral Federal forum. When my client tried to remove here, they were confronted with Mr. Hyatt's quite correct objection that the Eleventh Amendment prevented removal to Federal court. But my goodness, you have now converted the Eleventh Amendment, clearly designed to enhance the sovereignty of the States, into what Chief Justice Rehnquist called an albatross around their neck, that they are the one party that is least favored even compared to an ordinary litigant. That can't be right. And, of course, the granddaddy of all of the anomalies here is the idea that Chisholm could have sued Georgia in South Carolina State court. This Court doesn't lightly overrule its precedents, but when it's faced with an anomaly that dramatic and that inconsistent with the Founders understanding, it's time to overrule it, so. Kagan.       Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. I think this is a very hard case straight up. But it's not straight up, right? You need a special justification on your side. So what is your special justification? By special justification is workability, consistency with precedent. Those are all of the same and lack of reliance interest. I mean, the special justification is there, but then this Court elaborates a variety of principles that govern when it overrules precedents, and I think all of them point in our favor. Thank you, Your Honor. Thank you, counsel. The case is submitted.